UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA BECKROW,

               Plaintiff,                           Civil Action No. 11-cv-13169

        v.                                 District Judge Thomas L. Ludington
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

      Plaintiff Tina Beckrow brings this action pursuant to 42 U.S.C. § 405(g) challenging the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her application

for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary

judgment motions (Dkts. 11, 12), which are presently before this Court for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

## I. RECOMMENDATION

      For the reasons set forth below, this Court finds that the Administrative Law Judge did not

comply with the treating-source rule in evaluating the opinions of Plaintiff's doctors. Accordingly,

this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that

Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42

U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II.  REPORT

### A.  Procedural History

On March 10, 2009, Plaintiff filed an application for DIB asserting that she became unable to work on October 5, 2008.  (Tr. 13.)  The Commissioner initially denied Plaintiff's disability application on May 26, 2009.  (*Id.*)  Plaintiff then filed a request for a hearing, and on March 29, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Andrew G. Sloss, who considered the case *de novo*.  (Tr. 33-67; 13-22.)  In a May 5, 2010 decision, ALJ Sloss found that Plaintiff was not disabled.  (Tr. 13-22.)  His decision became the final decision of the Commissioner on May 25, 2011 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on July 21, 2011.  (Dkt. 1.)

### B.  Background

Plaintiff was 41 years old on the alleged disability onset date.  (*See* Tr. 34.)  She has a high-school degree and is certified as a nursing assistant.  (Tr. 34.)  In the past, Plaintiff worked as a nursing assistant and a waitress.  (Tr. 168-83.)

#### 1.  *Plaintiff's Testimony at the Hearing Before the ALJ*

Plaintiff testified to low-back pain at her administrative hearing.  Plaintiff was run-over by a trailer in October 2008, and testified that her back pain began shortly thereafter.  (Tr. 35, 536.)  She told the ALJ that in June 2009, she had a spinal fusion but that surgery did not resolve her pain.  (Tr. 35-36.)

Plaintiff's right foot and left leg were also injured in the trailer accident.  She attested that her right foot "seems to be doing all right" but her left leg continued to give her problems.  (Tr. 36.)  She testified that if she does a lot of walking, she falls.  (Tr. 36.)  To reduce the swelling in her left

leg, Plaintiff stated that she elevates her leg using a pillow and a recliner three to four times a day. (Tr. 37.) She also testified that she ices her leg "20 to 30 minutes every half hour to an hour" and takes pain medication. (Tr. 37-38.)

Plaintiff also testified to mental impairments. She stated that she takes medication for bipolar disorder and depression. (Tr. 38.) She described her symptoms as follows: "I don't feel like going nowhere, I don't feel like getting dressed, I could sleep all day which I do, you know, because of the pain medication. I just at times don't feel [worthy] . . . of helping . . . my daughter or anybody else." (Tr. 38.)

Regarding her residual functional ability, Plaintiff testified that it now takes her two days to do housework that previously took her two hours. (Tr. 38.) She stated that when she goes grocery shopping she uses a motorized cart. (*Id.*) She also testified that she can comfortably sit in a chair for only about ten minutes and can walk about 20 yards. (Tr. 39.) Plaintiff said that the heaviest item she lifts is a gallon of milk. (*Id.*) Plaintiff also attested that, due to pain, she does not sleep well at night and then naps for two or three hours during the day. (Tr. 41.)

### 2. Medical Evidence

#### (a) Medical Evidence Relating to Plaintiff's Physical Impairments

In November 2007, Dr. Gerald Schell performed an anterior fusion of Plaintiff's cervical spine to treat cervical disk disease, cervical radiculopathy, and chronic pain. (Tr. 239, 530.) In May 2008, however, Plaintiff told Dr. Schell that she had been experiencing pain in her neck, shoulder, and arms. (Tr. 239.) In September 2008, Dr. Schell concluded that Plaintiff's diagnostic test results did not demonstrate "major compressive effect" and that Plaintiff did not have a "measurable neurologic deficit." (Tr. 247.) He did find that Plaintiff's neck had a limited range of motion,

however, and noted that Plaintiff "may very well benefit from some physical therapy of the lumbar spine and some epidural injections." (*Id.*)

In October 2008, Plaintiff went to the emergency room for injuries sustained when she was run over by a parade-float trailer. (Tr. 250.) She told the emergency room staff that the float ran over her left leg and right foot but that her right foot was "better now." (*Id.*) Plaintiff suffered a left-thigh wound which required some skin removal and, later, vacuum therapy and a skin graft. (Tr. 404, 446, 456-57.) X-rays of Plaintiff's left knee revealed no evidence of fracture, malalignment, joint effusion, or arthritic change. (Tr. 254.) The emergency-room physician gave Plaintiff a left-knee immobilizer and crutches, and advised her to keep her leg elevated and to ice it 20-30 minutes per hour. (Tr. 250.) The physician also prescribed Vicodin. (Tr. 257.)

In November 2008, Plaintiff began physical therapy. (Tr. 279.) In February 2009, Plaintiff reported to her physical therapist that, while she was walking better, sitting increased swelling and she had difficulty finding a good position for sleeping. (Tr. 271.) The therapist noted that Plaintiff walked with a "significant limp." (Tr. 295.) A February 14, 2009 MRI showed fluid around Plaintiff's left-knee joint and a small effusion in the joint. However, the MRI did not reveal a tear in the medial or lateral meniscus, and Plaintiff's ACL, PCL, medial and lateral collateral ligaments showed no discontinuity. (*Id.*)

In March 2009, Dr. Anthony de Bari, a surgeon, performed a manipulation of Plaintiff's left knee while she was under anesthesia. (Tr. 475; *see also* Tr. 538-41.) Prior to the procedure, Plaintiff had range of motion of 10 to 90 degrees but after the manipulation Dr. de Bari was able to fully flex and extend Plaintiff's knee. (Tr. 475.) In a two-week followup appointment with Jason Maxa, a physician assistant in Dr. de Bari's office, Plaintiff was able to fully extend her knee and

flex her knee to nearly 110 degrees. (Tr. 542.) Plaintiff was referred to Dr. Paul LaClair, a Physical Medicine and Rehabilitation specialist, and continued on physical therapy. (Tr. 542.)

In May 2009, Dr. LaClair examined Plaintiff for the first time. (Tr. 510.) His impression was:

> [Patient] has some features of complex regional pain syndrome, including swelling and allodynia.[1] There has been a soft tissue injury to the knee with some local nerve damage, which may be playing a role as well. There is suggestion of disc pathology on a lumbar MRI. I have not seen the films. I do not see frank evidence of lumbosacral radiculopathy on her examination at this time. She likely has some mechanical low back pain due to significant gait disturbance that results from the knee pain.

(*Id.*) He recommend physical therapy, started Plaintiff on a trial of Neurontin for her leg pain, and concluded that Plaintiff could not work, and needed household assistance for cleaning, laundry, meal preparation, and yard work. (*Id.*)

In June 2009, Plaintiff returned to Dr. Schell for another surgery, this time on her lumbar spine. (Tr. 511-12.) A pre-surgery examination report completed by Dr. Schell summarizes the lumbar-spine problems Plaintiff was experiencing:

> This patient is a 42-year-old white female who has had problems with severe pain in her back and pain in her lower extremities which has been quite problematic and disabling. She does have significant degenerative lumbar disk disease at the L4-L5 and L5-S1 level of her lumbar spine. She has also had cervical disk disease, having undergone an anterior cervical fusion back in 2007. She has not responded to conservative treatments, and because . . . [her] pain has affected her activities of daily living and she has been miserable . . . she is being admitted to the hospital now for a lumbar fusion directed at L4-L5 and L5-S1 level . . . .

---

[1]Allodynia is defined as "pain resulting from a non-noxious stimulus to normal skin." *Dorland's Illustrated Medical Dictionary*, 52 (31st ed. 2007).

(Tr. 514.)

On July 20, 2009, Plaintiff had a followup visit with Dr. LaClair. He noted that post-fusion, her back pain was better controlled. He remarked that Plaintiff was "trying to walk to exercise but the left knee is still giving her problems. It swells intermittently. She has lost some motion since she has been out of therapy." (Tr. 507.) He noted that Plaintiff was "getting much less allodynia and hypersensitivity over the left knee while using Neurontin." (Tr. 507.)

A few days later, Plaintiff returned to Dr. de Bari for further evaluation of her left knee. (Tr. 544-45.) As a result of physical therapy, Plaintiff's range of motion was substantially better but she continued to have swelling and pain. (Tr. 544.) Plaintiff also reported continuing to walk with a limp and experienced discomfort when climbing stairs. (*Id.*) On exam, Dr. de Bari found diffuse swelling and tenderness. (*Id.*) He provided Plaintiff with a cortisone injection and noted, "If this does not provide relief[,] we are going to schedule an arthroscopy of the left knee." (Tr. 545.)

In August 2009, Dr. de Bari performed arthroscopic surgery on Plaintiff's left knee. (Tr. 554.) In her two-week, post-surgery followup, Plaintiff reported to Physician Assistant Maxa that she still had soreness and had not noted much benefit from the surgery. (Tr. 552.) She was advised to continue with physical therapy. (*Id.*)

In September 2009, Plaintiff returned to Dr. LaClair. (Tr. 703.) Plaintiff reported that her back pain was doing well. (Tr. 703.) Dr. LaClair noted, "[t]he left leg and knee continue[] to be an issue. She had a knee scope with Dr. de Bari several weeks ago. That really didn't change her symptoms in the knee. She continues to have some inflamation and intermittent swelling." (Tr. 703.) On exam, Dr. LaClair found that Plaintiff's knee range of motion was 5 to 110 degrees, and

that she had sensory alteration and some hyperesthesia.[2]  He increased Plaintiff's Neurontin prescription, provided a new knee brace, and scheduled electrodiagnostic testing.  (Tr. 703.)

In October 2009, Dr. LaClair performed the scheduled testing and found evidence of peroneal neuropathy in the left lower leg.  (Tr. 701.)  The "EMG of the right leg reveal[ed] only chronic L4 radiculopathy," which was likely attributable to Plaintiff's lumbar issues.  (*Id.*)  Dr. LaClair concluded that Plaintiff was not fit to return to work, noting that her job as a nursing assistant was "quite physical."  (*Id.*)  A contemporaneous physical therapy note provides that Plaintiff was having difficulty in most activities of daily living including sitting with her knees flexed and prolonged standing.  (Tr. 682.)  The therapist remarked, "if [patient] does not respond to further therapy she will be discharged.  Modalities have been exhausted."  (Tr. 682.)

Later in October 2009, Plaintiff saw Dr. Scott Greenwald (apparently for the first time) for her left-knee pain.  (Tr. 622-24.)  Dr. Greenwald found that Plaintiff's gait was antalgic, she could not stand on her left heel or toes, and that Plaintiff had numbness and dysesthesia over her left knee. (Tr. 623.)  Dr. Greenwald performed a knee injection to "block" the "left infrapatellar branch of the saphenous nerve."  (Tr. 624.)  Plaintiff received a second infrapatellar block from Dr. Greenwald at the end of October 2009.  (Tr. 621.)  However, the next day, Plaintiff had a "significant increase in her pain" and sought treatment from the emergency room.  (Tr. 620.)[3]

In November 2009, Plaintiff returned to Dr. LaClair for another followup.  (Tr. 699-700.)

---

[2]Hyperesthesia is defined as "a painful sensation from a normally painless touch stimulus." *Dorland's Illustrated Medical Dictionary*, 900 (31st ed. 2007).

[3]The cause of this pain is not apparent from the records; a November 2, 2009 follow-up with Dr. Greenwald twice states that the procedure was done under "strict sterile" conditions.  (Tr. 620.) Dr. Greenwald discussed with Plaintiff the possibilities of "general mechanical irritation from the needle or medications or potential risk of infection."  (Tr. 620.)

Plaintiff reported that her left leg had been giving out resulting in a couple falls. (Tr. 699.) Dr. LaClair noted that Plaintiff had been using a cane intermittently to improve her balance and was also intermittently wearing a knee brace. (*Id.*) On exam, Dr. LaClair found: "The left knee fully extends, however as she brings it back into flexion while seated on the table there is an audible 'pop' that appears to come from the knee. She grimaces and reports that the sensation is quite painful. Straight leg raise is negative bilaterally. There is decreased ankle dorsi flexor strength left relative to right consistent with her peroneal neuropathy." (Tr. 699.) In response to an inquiry from an insurer, Dr. LaClair reaffirmed that Plaintiff required "household assistance for physical activities such as laundry, grocery shopping and yard work." (Tr. 700.) He continued Plaintiff on Neurontin and prescribed a trial of Lyrica. (*Id.*) He also recommended that Plaintiff return to another physician who had previously provided injections that gave some pain relief. (*Id.*)[4]

At the end of January 2010, Plaintiff returned to Dr. LaClair. He noted that she was no longer taking Neurontin or Lyrica and had instead began taking Baclofen, which caused "a bit of sedation," and Vicodin as needed. (Tr. 696.) Dr. LaClair provided Plaintiff with a left-knee corticosteroid injection. (*Id.*) He then provided the following functional limitations:

> We will impose permanent activity restrictions as she is at maximum medical improvement.
>
> Her restrictions will include sedentary work only, no crawling, kneeling or squatting and no prolonged standing or walking. She

---

[4]Throughout 2009 Plaintiff also attended a foot clinic for the right-foot injury she sustained in the float accident. (Tr. 604-19.) In February 2009, Plaintiff reported pain and burning in her right foot and a peripheral nerve block was provided for pain. (Tr. 608.) In April 2009, Plaintiff stated that her right foot was slowly improving but that she still had pain on the top of her foot. (Tr. 612.) In August 2009, Plaintiff received another peripheral nerve block and noted "overall and more recent improvement." (Tr. 614.) In October 2009, Plaintiff reported overall improvement with minimal discomfort in her right foot. (Tr. 619.) She received another injection. (*Id.*)

reports that she is considering filing for social security disability, which I believe is appropriate.

(Tr. 697.)

On March 1, 2010, Plaintiff had another followup visit with Dr. LaClair. (Tr. 694-95.) She reported that her left foot (or toes) had been "catching" causing her to fall down six times since her previous visit. (Tr. 694.) Dr. LaClair noted that the cortisone shot from January relieved Plaintiff's knee pain for about a week-and-half. (*Id.*)

On March 12, 2010, Dr. LaClair responded to a letter from Plaintiff's then-counsel. (Tr. 723.) Dr. LaClair summarized Plaintiff's condition and provided functional limitations:

> I have treated [Ms. Beckrow] since May 15th, 2009 for complaints of low back and left leg pain. She suffered an injury to the left leg on October 5th, 2008 when she was run over by a trailer. This injury resulted in significant soft tissue trauma and damage to the left thigh, as well as pain in the low back and pain in the knee. Ms. Beckrow underwent lumbar decompression fusion surgery with Dr. Schell on June 9th, 2009 with some improvement in her low back pain. She still has left thigh and knee pain which is functionally disabling. She has intolerance for prolonged walking or standing. She must change positions frequently in order to achieve symptomatic control and must lie down periodically throughout the day in order to control her symptoms. She has difficulty completing even light household chores such as cleaning or vacuuming. Electrodiagnostic testing on the lower limbs did reveal nerve damage associated with soft tissue trauma on the left leg, as well as right L4 radiculopathy. Ms. Beckrow has been using analgesic medications to control pain. These include Vicodin occasionally, Baclofen[,] . . . and Lidocaine cream. She does note sedation with the Baclofen which interferes with her ability to concentrate. Because of the variable pain which at times is quite severe, the sedative effects of the pain medications and the intolerance for physical activities such as standing, squatting, kneeling or walking on a repetitive basis, I do not believe that Ms. Beckrow can return to the competitive work environment. I believe that she would miss considerable time from work due to significant pain and I do support her application for social security disability. I feel that she is totally and permanently disabled as a result of the lumbar and lower limb injuries that she has sustained.

(Tr. 723.)

### (b) Medical Evidence Relating to Plaintiff's Mental Impairments

In October 2007, Plaintiff underwent a psychological assessment with a social worker at List Psychological Services, PLC ("List Psychological"). The assessment noted Plaintiff's then-upcoming cervical fusion and that she had been laid off (but then asked to work part time). (Tr. 557-59.) The social worker explained, "[t]he added financial strain is a trigger for her depression." (Tr. 557.) Plaintiff's reported personal history included a father and step-mother with alcohol problems, being physically abused by her father at least once, and rape by a step-uncle. (Tr. 555.) The social worker provided a diagnosis of "Depressive Disorder, [Not Otherwise Specified]" and assigned Plaintiff a Global Assessment Functioning ("GAF") score of 51. (Tr. 564.)[5]

Beginning in early 2008 and through the summer of 2009, Plaintiff received treatment, in the form of counseling and medication, at List Psychological. Dr. Mudhumalti Bhavasar, and later, Dr. Niru Gill, provided medication reviews and prescribed medication. (Tr. 579-93, 602-03.) In March 2008, Plaintiff reported to Dr. Bhavasar that she felt depressed and irritable, and had been crying and not sleeping since her son moved out. (Tr. 580.) In April 2008, Plaintiff reported that medication and therapy were helping her. (Tr. 581.) In an August 2008 psychological evaluation by Dr. Gill, Plaintiff reported sleeping and eating well and denied any manic episodes or signs of

---

[5]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV* at 34.

psychosis. (Tr. 583.) Dr. Gill noted that Plaintiff's speech was normal but her affect was blunted and her mood was depressed. (Tr. 585.) He diagnosed major depressive disorder and assigned a GAF score of 50. (Tr. 585.) In June 2009, Dr. Gill noted that Plaintiff was "doing better overall" but also had up and down moods. Dr. Gill diagnosed bipolar disorder, depressive type with psychotic features. (Tr. 592.) In July 2009, Plaintiff reported that she felt good, was "on level" and denied side effects of her medication. (Tr. 593.)

For insurance reasons, in October 2009, Plaintiff began mental-health treatment at Tuscola Behavioral Health Systems ("TBHS") in Michigan. (Tr. 625-45.) Dr. Usha Movva, a psychiatrist, and a social worker completed an "Initial Formulation." (Tr. 625-27.) Plaintiff reported that withdrawal from others was a severe problem and sudden mood changes and a lack of energy were serious problems. (Tr. 626.) Plaintiff rated depression, anxiety, thoughts of homicide, not liking self, and problems with children as moderate problems. (Tr. 626.) Dr. Movva and the TBHS social worker diagnosed Plaintiff with Bipolar I Disorder, most recent episode depressed, and assigned Plaintiff a GAF score of 45. (Tr. 627.)[6]

On November 24, 2009, Dr. Movva completed a mental-status exam of Plaintiff. (Tr. 628.) He found that Plaintiff's appearance and grooming were fair, she was able to perform serial sevens (repeatedly subtracting seven starting from 100), and able to recall 3 objects (out of 3) both immediately and after five minutes. (*Id.*) Dr. Movva also found that Plaintiff's attention and concentration were "fair." (*Id.*) However, Dr. Movva noted that Plaintiff appeared somewhat sedated, her affect was restricted, and her mood was mildly anxious. Dr. Movva also found that

---

[6]A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *DSM-IV* at 34.

Plaintiff's responses were "somewhat slow." (*Id.*) He diagnosed Plaintiff with bipolar disorder, depressed, and assigned her a GAF score of 45-50. (*Id.*) Dr. Movva continued Plaintiff on her medications and recommended that she monitor her attention, concentration, and memory, and continue with outpatient services. (*Id.*)

In January 2010, Plaintiff returned to Dr. Movva for a medication review. (Tr. 647.) Plaintiff reported sometimes feeling depressed and having a difficult time because her son was out of her life. (*Id.*) Dr. Movva also found that Plaintiff had gained weight. (*Id.*) Plaintiff's affect was "reactive," but she denied thoughts of harming herself or others; she also denied auditory and visual hallucinations. (*Id.*) Dr. Movva noted, "[n]o evidence of side effects." (*Id.*) He added Prozac to Plaintiff's other medications. (*Id.*)

On February 27, 2010, Dr. Movva completed a form indicating that Plaintiff's mental conditions satisfied Listing 12.04, Affective Disorders. (Tr. 676-77.)[7] Regarding the Listing's "A"

---

[7]Dr. Movva indicated that Plaintiff's mental condition satisfied Listing 12.04 because her symptoms and limitations satisfied the "A" and "B" criteria of the Listing. To satisfy those criteria, a claimant must have

> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>> 1. Depressive syndrome characterized by at least four of the following:
>>> a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions or paranoid thinking; or
>>
>> 2. Manic syndrome characterized by at least three of the following:
>>> a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e. Decreased

criteria, he checked the entries that Plaintiff had depressive syndrome characterized by (1) pervasive loss of interest in almost all activities, (2) appetite disturbance, (3) sleep disturbance, (4) difficulty concentrating or thinking, and (5) thoughts of suicide. (Tr. 676.) He also indicated that Plaintiff met the "A" criteria because she had manic syndrome characterized by (1) hyperactivity (racing thoughts), (2) decreased need for sleep, (3) easy distractibility, and (4) hallucinations, delusions, or paranoid thinking (in the form of a car approaching her driveway). (*Id.*) He further found that Plaintiff had "marked" difficulties in two of the four "B" criteria associated with the Listing: social functioning and concentration, persistence, or pace. (Tr. 677.) Dr. Movva wrote, "Ms. Beckrow [has been] in treatment on and off since age 17. Continues to have periods of depression resulting in medication adjustment." (*Id.*)

---

need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. pt. 404, subpt. P, app. 1.

*(c) Opinions on Behalf of the State Disability Determination Services*

In May 2009, a non-physician, State Disability Determination Services ("DDS") consultant reviewed Plaintiff's medical records and provided a physical residual functional capacity assessment. The reviewer noted, in part, that Plaintiff's "biggest issue[] does appear to be her crush injury which required substantial treatment and phys[ical] therapy. However, at this time the [claimant] appears to be improving slowly and is expected to improve. The limitations that the [claimant] alleges are supported by [the medical evidence of record] but are also expected to improve. Consider [claimant's] statements mostly credible." (Tr. 497.) The reviewer provided that Plaintiff could lift 10 pounds frequently, stand for two hours and sit for six hours during an eight-hour workday, was limited in pushing and pulling in the lower extremities, but could occasionally stoop, kneel, crouch, and climb stairs. (Tr. 491-92.)

Also in May 2009, Dr. Bruce Douglass reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form for the State DDS. (Tr. 476-89.) Dr. Douglass found that Plaintiff had a medically determinable mental impairment in the category of "Affective Disorders" but that Plaintiff's mental impairment was "Not Severe." (Tr. 476.) Dr. Douglass also rated Plaintiff's "B" criteria as follows: Plaintiff had "mild" limitations in (1) activities of daily living, (2) social functioning, and (3) concentration, persistence, or pace, and (4) had no episodes of decompensation of extended duration. (Tr. 486.)

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

A vocational expert ("VE") also provided testimony at Plaintiff's administrative hearing. Relating to step five of the ALJ's five-step disability determination, the ALJ asked the VE to consider someone of Plaintiff's age, education, and past relevant work experience who could

perform sedentary work[8] with only occasional ramp or stair climbing; occasional stooping, crouching, or kneeling; no ladder, rope, or scaffold climbing; no crawling; and only moderate exposure to hazards.  (Tr. 42.)  The VE testified that the hypothetical individual could perform sedentary unskilled jobs: surveillance system monitor (400 jobs in Michigan's lower peninsula), information clerk (2,500 jobs), and hand packer (2,100 jobs).

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits

---

[8]*See* S.S.R. 83-10, 1983 WL 31251, at *5 ("The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . .  Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday").

are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since October 5, 2008 – Plaintiff's alleged onset date. (Tr. 15.) At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease, degenerative joint disease, right foot and left leg." (Tr. 15.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 19.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work with only occasional ramp or stair climbing; occasional balancing, stooping, crouching, or kneeling; no ladder, rope, or scaffold climbing; no crawling; and only moderate exposure to hazards. (Tr. 19.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 20.) At

step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: information clerk and packager. (Tr. 21.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

**F. Analysis**

Plaintiff raises three claims of error on appeal. Plaintiff first asserts that the ALJ erred in applying the treating-source rule to the opinions of two of her treating doctors. (Pl.'s Mot. Summ. J. at 3-7.) Next, Plaintiff claims that the ALJ erred in finding that her mental impairments were not severe and that the ALJ's residual functional capacity ("RFC") assessment did not adequately account for her mental limitations. (*Id.* at 7-8.) Finally and similarly, Plaintiff argues that the ALJ erred in failing to find two particular diagnoses (left, lower-leg neuropathy and right L4 radiculopathy) were severe physical impairments and that the ALJ's residual functional capacity assessment did not adequately account for all of her physical limitations. (*Id.* at 9-10.) The Court considers these claims of error in turn.

*1. The ALJ Did Not Correctly Apply The Treating Source Rule*

Plaintiff argues that the ALJ failed to "evaluate or weigh" Dr. Paul LaClair's March 2010 opinion which violates the procedural aspects of the treating-source rule. (Pl.'s Mot. Summ. J. at 3, 5.) The Court agrees.[9]

The treating-source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source. In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); S.S.R. 96-2p, 1996 WL 374188 (1996). And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must then consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. § 404.1527.

In addition, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record"). The purpose for this procedural requirement is two-

---

[9]The Commissioner does not dispute that Dr. LaClair is a treating source.

fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5.

At the end of January 2010, Dr. LaClair provided that Plaintiff was at her "maximum medical improvement" but she could nonetheless only perform sedentary work with "no crawling, kneeling or squatting and no prolonged standing or walking." (Tr. 697.) Then, in March 2010, Dr. LaClair opined that Plaintiff's knee pain was "functionally disabling," that she had "intolerance" for "prolonged" standing or walking, that she had to change positions "frequently," and that she had to "lie down periodically throughout the day in order to control her symptoms." (Tr. 723.) He also opined that because of Plaintiff's pain, the sedative effects of her pain medications, and her "intolerance for physical activities such as standing, squatting, kneeling or walking on a repetitive basis," Plaintiff could not return to the competitive work environment. (*Id.*)

The ALJ acknowledged both of these functional assessments from Dr. LaClair. (Tr. 17.) In fact, he provided a lengthy summary of both evaluations in his narrative. (*Id.*) Problematically, however, the ALJ never stated whether he was giving Dr. LaClair's opinions controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). Nor did he state that he was rejecting the opinions. And because the ALJ did not assign a particular weight to Dr. LaClair's opinions, it necessarily follows that he did not, as required, provide "good reasons" for the weight assigned. The Sixth Circuit has indicated

that remand is warranted when an ALJ fails to assign a weight to a treating-source opinion (and, therefore, reasons for the weight assigned) and fails to evidence that he considered the weighting factors set forth in 20 C.F.R. § 404.1527:

> Even assuming *arguendo* that the ALJ correctly reached her determination that [the treating source] should be discredited, the ALJ's summary rejection of [the treating-source] without explaining the weight given his opinions falls short of the Agency's own procedural requirements: "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.*

*Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). And more recently:

> After accepting [the treating-source's] diagnosis, the ALJ then rejected the conclusions contained in her RFC assessment about the severity of [the claimant's] impairments as they relate to work. Before doing so, the ALJ failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions, and the Commissioner conceded at oral argument that the ALJ did not assign a specific weight to [the treating source's] RFC assessment. This alone constitutes error.

*Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Blakely*, 581 F.3d at 408).

It is true that in the context of evaluating Plaintiff's credibility, the ALJ stated that Plaintiff's "treating physician's statement is consistent with the above residual capacity." (Tr. 20.) Assuming that the ALJ was referring to Dr. LaClair and not Dr. Movva, this statement does not satisfy the explanatory requirement associated with the treating-physician rule because it is not supported by substantial evidence. Dr. LaClair opined in January 2010 that Plaintiff could perform "no . . . kneeling or squatting." (Tr. 697.) But Plaintiff's RFC permits "occasional" stooping, crouching, and kneeling (Tr. 19) – i.e., performing those activities for up to one-third of the workday, *see* S.S.R.

83-10, 1983 WL 31251 at *5; S.S.R. 96-9p, 1996 WL 374185, at *3. Dr. LaClair also provided that (1) Plaintiff needed to frequently change positions and (2) had to lie down throughout the day in order to alleviate her pain. Neither of these functional limitations are apparent in the ALJ's RFC assessment, and it is entirely unclear if the ALJ rejected these limitations or instead believed the RFC assessment accounted for them.

On appeal, the Commissioner argues that an "ALJ need not accept a physician's opinion that is inconsistent with his own contemporaneous treatment notes" and that Dr. LaClair's opinion is "inconsistent with the record as a whole." (Def.'s Mot. Summ. J. at 17, 19 (citing 20 C.F.R. § 404.1527(d)(3)).) The Commissioner is correct that an ALJ need not give an unsupported or contradicted treating-source opinion controlling weight. The problem here, however, is that the ALJ did not conclude that Dr. LaClair's opinions were unsupported by his treatment notes or contradicted by other medical evidence in the record. Thus, even if the Commissioner's assertions about Dr. LaClair's opinions are correct, the ALJ did not provide those reasons to Plaintiff. The Commissioner's reasons for rejecting Dr. LaClair's opinions offered for the first time on appeal do not retroactively create compliance with the treating-source rule. *See Roso v. Comm'r of Soc. Sec.*, No. 5:09-CV-198, 2010 WL 1254831, at *16 (Mar. 11, 2010) *adopted by* 2010 WL 1254833 (N.D. Ohio Mar. 25, 2010) ("Moreover, neither the ALJ nor the Appeals Council reasoned that treating source opinions contained in the record were being discounted because they were offered outside of the insured period. The treating source rule requires the Commissioner to articulate his reasons for discounting these opinions. The Commissioner's post hoc rationalization at this stage is insufficient."). As noted, the dual purposes behind the treating-source rule is to permit a claimant and this Court to understand whether and why the ALJ rejected a treating-source opinion. *See*

*Wilson*, 378 F.3d at 544.

Because the ALJ did not comply with the procedural aspect of the treating-physician rule in evaluating Dr. LaClair's opinions, remand is warranted – even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).[10]

Plaintiff also argues that the ALJ erred in evaluating Dr. Usha Movva's February 2010

---

[10]Although not raised by the Commissioner, the Court has considered the harmless-error exceptions to the explanatory requirement. *See Wilson*, 378 F.3d at 547 (providing a violation of the procedural requirement might be harmless error if (1) the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation."). None apply in this case. Nothing suggests that Dr. LaClair's evaluation was so extreme or unsupported as to be patently deficient. And, as already discussed, the ALJ did not adopt Dr. LaClair's functional limitations. Finally, the Court cannot conclude that the ALJ met the goal of the treating source rule; the ALJ's summary of the medical evidence does not sufficiently demonstrate that Dr. LaClair's functional limitations were inconsistent with the evidence or that his opinions were unsupported. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("[T]he procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.").

opinion finding that Plaintiff met or medically equaled Listing 12.04, Affective Disorders.  In this regard, the ALJ stated:

> The undersigned has considered the information provided by the claimant's representative and signed by Dr. Movva, concerning listing 12.04.  The opinion is accorded limited weight as it lacks support for a continuous period of not less than 12 months and is inconsistent with the treatment records provided.  The evidence shows she is living independently, is medication compliant and is making progress.

(Tr. 18.)

The Court tends to agree with Plaintiff that these were not the requisite "good reasons" for rejecting Dr. Movva's opinion.  The ALJ's explanation borders on evading meaningful appellate review.  The ALJ made no attempt to identify which findings by Dr. Movva were unsupported or which medical evidence in the record was inconsistent with his opinion.  *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").[11]  In this case, because remand is already warranted due to the ALJ's mishandling of Dr. LaClair's opinions, the Court will not attempt to divine what the ALJ intended to reference when he concluded that Dr. Movva's opinion "lacks support" and "is

---

[11]In *Friend*, the ALJ provided the following rationale for discounting the opinion of a treating-source, Dr. Angerman: "the testimony of Dr. Nusbaum, which would allow the claimant to stand/walk for . . . a total of six hours in an eight hour workday, is more consistent with the objective medical findings," and "there is no basis for Dr. Angerman's conclusion that the claimant can stand/walk for only one hour in a day."  375 F. App'x at 551.  The Sixth Circuit held, "This is not 'sufficiently specific' to meet the requirements of the [treating-source] rule on its face, inasmuch as it neither identifies the 'objective clinical findings' at issue nor discusses their inconsistency with Dr. Angerman's opinion."  *Id.*

inconsistent with the treatment records provided." Accordingly, the Court recommends that on remand, the ALJ provide a more thorough explanation for why he provided Dr. Movva's opinion "little weight."

### 2. *Plaintiff's Claim that the ALJ Erred at Step Two In Evaluating Her Mental Impairments Is Moot*

Plaintiff next argues that the ALJ erred at step two of the five-step disability determination process by concluding that "[t]he claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (Pl.'s Mot. Summ. J. at 7 (citing Tr. 18).)

However, the Commissioner correctly argues that where an ALJ finds some severe impairments at step two, but erroneously excludes others, the error is harmless so long as the ALJ continues with the five-step disability determination and accounts for the omitted impairments in subsequent steps (by, for example, including limitations corresponding to the impairment in the RFC assessment). *See Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006).

Perhaps in view of this case law, Plaintiff argues, "Because the ALJ concluded that, in his opinion, the Plaintiff's mental impairments were 'non-severe,' he did not account for any mental limitations in posing hypothetical questions to the Vocational Expert or in forming an RFC." (Pl.'s Mot. Summ. J. at 8; *see also* Dkt. 15, Pl.'s Resp. to Def.'s Mot. Summ. J. at 3.) The premise of this argument, however, is that the ALJ incorrectly evaluated Dr. Movva's treatment records and his opinion regarding Listing 12.04. (Pl.'s Mot. Summ. J. at 8.) The Court has already concluded that the ALJ should more thoroughly explain why Dr. Movva's opinion is unsupported or contradicted by the medical evidence. Because this procedural task may result in substantive change – e.g., a revised step-three determination or RFC assessment – it is not now necessary to determine whether

substantial evidence supports the ALJ's decision to omit limitations in Dr. Movva's opinion from his RFC assessment (or hypotheticals to the VE).[12]

Accordingly, this ground for remand should be denied as moot.

### 3. Plaintiff's Claim that the ALJ Erred at Step Two In Evaluating Her Physical Impairments Is Moot

Plaintiff's last argument mirrors her second claim of error. She claims that the ALJ further erred at step two by failing to include diagnosed "Nerve Damage of the Left Lower Extremity" and "Right L4 Radiculopathy" as severe impairments (or, alternatively, by failing to adequately explain why those diagnoses were deemed not severe). (Pl.'s Mot. Summ. J. at 9-10.)[13] She also claims, relying on Dr. LaClair's records and opinions, that the physical limitations in the ALJ's RFC assessment (and hypotheticals to the VE) did not accurately reflect her physical abilities. (*Id.* at 9; *see also* Pl.'s Resp. to Def.'s Mot. Summ. J. at 4-5.)

As noted above, an ALJ's failure to include a severe impairment at step two is harmless where the omitted impairment is properly accounted for in the remaining three steps of the disability analysis. *See Riepen*, 198 F. App'x at 415. Yet, apart from citing the functional limitations provided by Dr. LaClair, Plaintiff has not offered any developed argument on how Plaintiff's left, lower-leg nerve damage or right-side L4 radiculopathy would have altered the ALJ's analysis at

---

[12]The parties engage in an extended discussion about the weight that should be accorded to the Psychiatric Review Technique Form completed by Dr. Douglass for the State DDS. The ALJ did not discuss Dr. Douglass' opinion in his narrative. Perhaps this is one of the pieces of evidence that the ALJ found inconsistent with Dr. Movva's opinion. If so, the ALJ should make this explicit on remand.

[13]Although Plaintiff does not specifically cite the medical record which supports these two alleged severe impairments, she apparently relies on the results of the electrodiagnostic testing performed by Dr. LaClair in October 2009. (Tr. 701.) That testing evidenced peroneal neuropathy in the left lower leg and right-side "chronic L4 radiculopathy." (*Id.*)

steps three through five. Instead, Plaintiff merely asserts that the ALJ's RFC assessment "do[es] not accurately account for all of [her] limitations" and that the "medical records . . . reveal far greater limitations than accounted for by the ALJ." (Pl.'s Mot. Summ. J. at 9.) Neither of these statements specify what additional limitations the ALJ should have, but did not, include in the RFC assessment. For example, Plaintiff has not explained how "Nerve Damage of the Left Lower Extremity" or "Right L4 Radiculopathy" precludes the residual functional capacity to stand or walk for two hours during an eight-hour workday.

It is true, however, that Dr. LaClair based his March 2010 opinion in part on the two diagnoses that Plaintiff now claims the ALJ failed to address at step two. (*See* Tr. 723 (discussing left, lower-leg nerve damage and right L4 radiculopathy).) And Plaintiff's third claim of error does assert that the ALJ should have included Dr. LaClair's functional limitations in defining her RFC. (*See* Pl.'s Mot. Summ. J. at 9; Pl.'s Resp. to Def.'s Mot. Summ. J. at 4-5.) But to the extent that this is Plaintiff's third argument, it is moot in view of this Court's recommendation for the ALJ to evaluate Dr. LaClair's opinion according to the treating-source rule on remand.

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ did not comply with the treating-source rule in evaluating the opinions by Plaintiff's doctors. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: April 12, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 12, 2012.

s/Jane Johnson
Deputy Clerk